IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JUAN CARDONA, | | |
| | Plaintiff, | No. 2:11-cv-1680 TLN KJN P |
| | vs. | |
| DALE SYVERSON, M.D., | | |
| | Defendants. | FINDINGS AND RECOMMENDATIONS |
| _____/ | | |

I. Introduction

    Plaintiff is a state prisoner, currently incarcerated at California State Prison-Corcoran, who proceeds in forma pauperis and without counsel in this civil rights action filed pursuant to 42 U.S.C. § 1983. This action proceeds on plaintiff's First Amended Complaint ("FAC"), filed September 15, 2011 (ECF No. 17), against sole defendant Dr. Dale Syverson, on the claim that defendant was deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment. Pending is defendant's motion for summary judgment. (ECF No. 30.) After plaintiff was informed of the requirements for opposing a motion for summary judgment, pursuant to Woods v. Carey, 684 F.3d 934 (9th Cir. 2012), and Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc) (ECF No. 38), supplemental briefing was permitted. Thus, plaintiff filed both an initial opposition (ECF No. 35), and supplemental

opposition (ECF No. 41), and defendant filed initial and supplemental replies (ECF Nos. 36, 42). For the reasons that follow, the court recommends that defendant's motion be granted.

II. Background

This action proceeds on plaintiff's verified First Amended Complaint ("FAC"), filed on September 15, 2011 (ECF No. 17). Plaintiff, who has Hepatitis C, contends that, in August 2007, Dr. Syverson punctured plaintiff's right lung while conducting a needle biopsy of plaintiff's liver, causing the collapse of plaintiff's lung, requiring placement of a chest tube, and resulting in a subsequent lung infection. Discovery closed on October 19, 2012. (ECF No. 29.)

Defendant moves for summary judgment on the ground that he is entitled to judgment as a matter of law, and because this action is allegedly time-barred.

III. Statute of Limitations

Defendant contends that this action is time-barred because filed outside the statute of limitations applicable to state law negligence claims. Defendant initially raised this contention in a motion to dismiss. (ECF No. 18.) Although the motion was denied without prejudice pursuant to the screening of plaintiff's FAC (ECF No. 22), defendant did not renew the motion, but again raised this claim in the pending motion for summary judgment.

Defendant asserts that plaintiff initiated this action beyond the one-year statute of limitations applicable to professional negligence actions in California, even if the limitations period is tolled for two years due to plaintiff's status as a prisoner. However, as discussed below, the applicable statute of limitations is now two years which, together with a two-year tolling period, did not expire before plaintiff timely initiated this action.

Section 1983 contains no statute of limitations. Hence, federal courts apply the state's personal injury statute of limitations, subject to any state tolling provisions that are not inconsistent with federal law. Wallace v. Kato, 549 U.S. 384, 387 (2007); Azer v. Connell, 306 F.3d 930, 935-36 (9th Cir. 2002). Effective January 1, 2003, the California statute of limitations for personal injury actions was extended from one year to two years. Cal. Code Civ. Proc. §

335.1; Maldonado v. Harris, 370 F.3d 945, 954-55 (9th Cir. 2004). In addition, under California law, prisoners sentenced "for a term less than for life" are accorded statutory tolling for a period of two years to file an action for damages on claims other than those challenging their conditions of confinement. Cal. Code Civ. Proc. § 352.1(a); Johnson v. State of California, 207 F.3d 650, 654 (9th Cir. 2000); Jones v. Blanas, 393 F.3d 918, 927 (9th Cir. 2004) (tolling based on "disability of imprisonment").

Defendant does not dispute plaintiff's representation that he is serving a sentence on a criminal conviction "for a term less than for life," and hence does not dispute plaintiff's reliance on the two-year tolling period of Section 352.1. Thus, the effective statute of limitations for filing the instant action was four years (two-year limitations period plus two-year statutory tolling period). The parties agree that plaintiff first knew of his injury on August 7, 2007, the date of his liver biopsy and lung collapse, and thus that plaintiff's claim accrued on that date. "Under federal law, a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." TwoRivers v. Lewis, 174 F.3d 987, 991 (9th Cir. 1999).

Within these parameters, the instant federal action was timely because commenced within four years after August 7, 2007. Plaintiff's original complaint was filed in this court on June 13, 2011, slightly more than 3 years, 10 months after plaintiff's claim accrued.[1] Therefore, this action was timely filed, and must be addressed on the merits.

IV. Summary Judgment

A. Legal Standards for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met. "The court shall grant summary judgment if

---

[1] The effective filing date of this action was even earlier, on June 2, 2011, when plaintiff signed and dated the original complaint, and presumably delivered it to prison authorities for mailing  See Douglas v. Noelle, 567 F.3d 1103, 1107 (9th Cir. 2009) (holding that "the mailbox rule" established in Houston v. Lack, 487 U.S. 266, 276 (1988), applies to Section 1983 suits filed by pro se prisoners, and thus that the "filing date" of a court document is the date plaintiff delivers the document to prison authorities for purposes of forwarding it to the court clerk).

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).) "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

////

B. <u>Legal Standards for Deliberate Indifference to Serious Medical Needs</u>

To prevail on a claim for deliberate indifference to serious medical needs, in violation of the Eighth Amendment's proscription against cruel and unusual punishment, a plaintiff must demonstrate that a prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994). Mere negligence is insufficient for Eighth Amendment liability. <u>Frost v. Agnos</u>, 152 F.3d 1124, 1128 (9th Cir. 1998).

"In the Ninth Circuit, the test for deliberate indifference consists of two parts. First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. This second prong . . . is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations, punctuation and quotation marks omitted). A mere difference of opinion between a prisoner and prison medical staff as to appropriate medical care does not give rise to a Section 1983 claim. <u>Franklin v. Oregon</u>, 662 F.2d 1337, 1344 (9th Cir. 1981).

Whether a defendant had requisite knowledge of a substantial risk of harm is a question of fact. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. The inference of knowledge from an obvious risk has been described by the Supreme Court as a rebuttable presumption, and thus prison officials bear the burden of proving ignorance of an obvious risk. . . . [D]efendants cannot escape liability by virtue of their having turned a blind eye to facts or inferences strongly suspected to be true . . . ." <u>Coleman v. Wilson</u>, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995), citing <u>Farmer</u>, 511 U.S. at 842-43 (internal quotation marks omitted).

When the risk is not obvious, the requisite knowledge may still be inferred by evidence showing that the defendant refused to verify underlying facts or declined to confirm inferences that he strongly suspected to be true. Farmer, 511 U.S. at 842. On the other hand, prisons officials may avoid liability by demonstrating "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Id. at 844. Thus, liability may be avoided by presenting evidence that the defendant lacked knowledge of the risk and/or that his response was reasonable in light of all the circumstances. Id. at 844-45; see also Wilson v. Seiter, 501 U.S. 294, 298 (1991); Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010).

C. Facts

The following facts are undisputed by the parties or, following the court's review of the record, have been deemed undisputed for purposes of the pending motion.

1. Plaintiff Juan Cardona is an inmate at California State Prison-Corcoran ("CSP-COR"). At all relevant times, plaintiff was incarcerated at High Desert State Prison ("HDSP").

2. Defendant Dr. Dale Syverson is a board-certified general surgeon, in private practice in Susanville, California.

3. On January 22, 2007, plaintiff, then 24 years of age, had a surgical consultation with Dr. Syverson. Plaintiff had a one-year history of Hepatitis C and needed a liver biopsy. Dr. Syverson's consultation notes provide in pertinent part: "Plan: Liver biopsy. The procedure, alternatives, and risks have been discussed with the patient. He understands and wishes to proceed with percutaneous ultrasound directed liver biopsy." (Jan. 22, 2007 Surgical Consultation (Dft. Exh. A; Pltf. Exh. A).)

4. On April 19, 2007, plaintiff had another surgical consultation with Dr. Syverson. The consultation notes provide in pertinent part: "Plan: Ultrasound-directed percutaneous needle biopsy of the liver. The procedure, alternatives, and risks have been

7


1  discussed with the patient. He understands and wishes to proceed with liver biopsy." (Apr. 19,
2  2007 Office Visit (Dft. Exh. B; Pltf. Exh. A).)

3      5. On August 6, 2007, a HDSP physician examined plaintiff before his medical
4  release, and noted in pertinent part that plaintiff "denied any chest pains, heart palpitations or any
5  shortness of breath or wheezing." (Aug. 6, 2007 History and Physical Examination, HDSP (Pltf.
6  Exh. B to Decl.).)

7      6. On August 7, 2007, Dr. Syverson performed the subject procedure, an
8  "ultrasound-guided percutaneous needle biopsy" of plaintiff's liver, at Lassen Surgery Center.
9  Dr. Syverson first attempted to obtain the biopsy by entering the 7th intercostal space between
10 plaintiff's ribs. Three passes of the needle were attempted, but none yielded an adequate amount
11 of liver tissue. Dr. Syverson then redirected the biopsy needle to a lower point, in the 9th
12 intercostal space, which was successful. Dr. Syverson's Operation Notes provide in pertinent
13 part (Aug. 7, 2007 Operation Report, Lassen Surgery Center (Dft. Exh. C; Pltf. Exh. B)):

> With the patient supine on operating table and under IV sedation the right upper quadrant of the abdomen and the right costal margin area was evaluated with the ultrasound. A point was chosen at approximately the 7th inter costal space at about the mid axillary line for liver biopsy. The patient's liver was somewhat contracted and mostly up under the costal margin. This area was then prepped . . . . A 1 mm incision was then made at this site, and the needle passed over the rib banded, deep enough to obtain a biopsy. However, after 3 passes of the needles, this did not yield sufficient material.
>
> Therefore the ultrasound was used to re-evaluate the right upper quadrant and the right costal margin, and a point at approximately the anterior axillary line and at about the 9th inter costal space was chosen. This was in close proximity to the gallbadder, but the directional vector that allowed for a safe biopsy was away from the gallbladder. This area was then prepped . . . .
>
> A 1 mm incision was made at this site, and the needle then passed over the rib and into the liver. Several passes were made and some liver biopsy was obtained.
>
> . . . . The patient was then awakened and taken to the recovery area in good condition. The procedure was somewhat difficult given the large dose of anesthesia required to achieve IV sedation for

8

        placement of the local anesthesia.

        The patient did however tolerate this well and was taken to the recovery are[a] in good condition.

      7. The August 7, 2007 Pathology Report by Dr. Jane Zhou provides in full (Pltf. Exh. D to Decl.):

        Hepatic parenchyma with mild portal/periportal and intralobular chronic inflammation without necrosis, modified Knodell Grade I.

        Pericellular fibrosis on Trichrome Stain, modified Knodell Stage O.

        No stainable iron seen on Prussian Blue Stain.

        Reticulum Stain highlights two-cell thick hepatic plates.

        No intracytoplasmic/intranuclear inclusions seen on periodic Acid-Schiff with Diastase Stain.

        Fragments of benign pulmonary parenchyma and skeletal muscle.

      8. Following the conclusion of the biopsy procedure on August 7, 2007, plaintiff initially appeared to be in good condition. However, after he was transferred to the Post-Anesthesia Recovery Unit ("PACU"), plaintiff began to complain of right-sided pain; a nurse documented crackle sounds in plaintiff's right lung. An x-ray taken in the PACU revealed a right-sided pneumothorax,[2] estimated at 20%. Plaintiff was then transported to Banner Lassen Medical Center for treatment of his pneumothorax. Dr. Syverson dictated the following notes at this interim juncture (Aug. 7, 2007 History and Physical (Dft. Exh. D)):

        Chief Complaint: Pleuritic pain, right side.

        History of Present Illness: This 24-year old male has hepatitis C

---

[2] According the U.S. National Library of Medicine, National Institutes of Health, a "pneumothorax," or "collapsed lung," is "the collection of air in the space around the lungs. This buildup of air puts pressure on the lung, so it cannot expand as much as it normally does when you take a breath. A collapsed lung occurs when air escapes from the lung and fills up the space outside of the lung, inside the chest." It may be caused by . . . certain medical procedures." See http://www.nlm.nih.gov/medlineplus/ency/article/ 000087.htm.

> and underwent a percutaneous ultrasound-directed needle biopsy of the liver earlier today at the surgery center. He developed a pneumothorax after that, and therefore is now being observed in the hospital with the understanding that he may need a chest tube.
>
> . . . Lungs: Good ventilation bilaterally, but there are a few rales at the right base.
>
> . . . Abdomen: . . . There is a dressing in the right upper quadrant over the right costal margin at the site of two need biopsies.
>
> Impression: Status post percutaneous ultrasound directed needle biopsy of the liver, now has a right sided pneumothorax.
>
> Plan: Observation and nasal prongs O2. If the patient has more trouble or an enlarging pneumothorax, he may need a chest tube.

9. An initial chest x-ray revealed the following (Aug. 7, 2007, Chest X-Ray (Dft. Exh. E; Pltf. Exh. D)):

> . . . Findings: PA and lateral views of the chest demonstrate a right sided pneumothorax of approximately 20 percent. There is a small right pleural effusion likely hemothorax. Left lung is clear. Cardiac silhouette is normal in size.
>
> Impression: Approximately 20 percent pneumothorax with small to moderate size right pleural effusion likely representing a hemothorax. [¶] Findings discussed with Dr. Syverson[.]

10. In response to these findings, Dr. Syverson inserted a tube into plaintiff's chest, to evacuate the effusion air and allow the collapsed portion of his lung to re-expand. Dr. Syverson's surgical notes recount his placement of a "right hemithorax chest tube" to treat plaintiff's "right hemopneumothorax." Placement of the tube required a 1.5 cm incision at "the right midaxillary line area at about the 5th intercostal space." The tube was "placed to a depth of about 12 cm. The chest tube was then attached to the Pleurovac unit at 20 cm of water suction." As a result, "[t]he patient drained 20 ml of dark bloody fluid. This was serosanguinous. There was a small pneumothorax noted by the amount of air obtained when the chest tube was placed. On chest x-ray this appeared to have been a 20% pneumothorax." It was noted that "[t]he patient tolerated this procedure well." (Aug. 7, 2007 Operation Report (Dft. Exh. F).)

11. A subsequent chest x-ray revealed the following (Aug. 7, 2007, Chest X-Ray (Pltf. Exh. E)):

> . . . Findings: Right pleural drain has been introduced in the pneumothorax compared to the chest film without the chest tube from 8/7/07. There is a small right subpulmonic pleural effusion and carotid markings right lung base. Upper normal heart size. Mediastinum not widened.
>
> Impression: Right pleural drain in position without pneumothorax. Small right pleural fluid and right basilar atelextasis.

12. Plaintiff's chest tube was left in until the pneumothorax resolved. Plaintiff remained at Banner Lassen Medical Center until August 10, 2007, when he was discharged in good condition and transferred back to HDSP. Dr. Syverson's Discharge Summary recounted that, "[a]fter a couple of days of chest tube suction, [plaintiff] appeared to have no pneumothorax, and after water seal without suction, there was no recurrent pneumothorax, and the hemothorax had completely drained. Therefore, the chest tube was then removed and the patient was transferred back to the prison." (Aug. 10, 2007 Discharge Summary (Dft. Exh. G; Pltf. Exhs. F, G).) Plaintiff was discharged with a prescription for viocodin, as needed, for pain; limited to light duty for one week; and instructed to use a "flutter spirometer to optimize ventilation," and to have the suture from the chest tube site removed on August 16, 2007. (Id.)

13. The August 10, 2007 addendum to plaintiff's HDSP August 6, 2007 examination notes, reflecting plaintiff's return to HDSP, observed that "[t]here is a closed wound right chest -- sutured, closed, following removal of chest tube due to pneumothorax following liver Bx. Lungs clear on oscillation." (Aug. 6, 2007 History and Physical Examination, HDSP (Pltf. Exh. B to Decl.).)

14. On September 10, 2007, plaintiff was again seen by Dr. Syverson, whose consultation notes provide in full (Sept. 10, 2007 Surgical Consultation Report (Pltf. Exh. C)):

> Follow-up visit: This 24-year-old male had hepatitis C and a biopsy was done. The biopsy was complicated by a right pneumothorax which required hospitalization and treatment with a

> chest tube. He has recovered from this and now wanted to discuss his biopsy report.
>
> The biopsy report was discussed. He had Grade I inflammation and Stage 0 fibrosis.
>
> I discussed this with the patient and noted that this was a limited sample and that some of the biopsy tissue obtained was actually lung tissue at the time of his liver biopsy. This would have been a better biopsy had more liver tissue been obtained.
>
> The patient is apparently being considered for Interferon and I noted that he does have elevated liver function tests which suggest ongoing inflammation.
>
> Plan: Consider for Interferon treatment.

15. HDSP medical clinic notes, dated September 11, 2007, indicate that plaintiff experienced chest pain on August 29, 2007 (approximately three weeks after his lung collapse), which was diagnosed as an infection that may have been secondary to his pneumothorax; effusion of the right lung base was noted, and it was recommended that plaintiff thereafter receive "interval evaluation." (Pltf. Exh. J.)

16. On September 15, 2008, plaintiff filed a complaint in the Lassen County Superior Court, alleging that Dr. Syverson had been medically negligent. Plaintiff alleged that he suffered "great mental and physical pain and suffering" due to the August 7, 2007 puncture of his lung. On October 5, 2009, the superior court granted Dr. Syverson's motion for summary judgment and, on October 28, 2009, entered a judgment of dismissal. (See Dft. Exhs. H (complaint); I (order granting defendant's motion for summary judgment); and J (judgment of dismissal).)

17. On June 13, 2011, plaintiff filed the instant federal civil rights action, alleging that defendant Dr. Syverson had been deliberately indifferent to plaintiff's serious medical needs, in violation of the Eighth Amendment's proscription against cruel and unusual punishment. Plaintiff alleges that, as a result of defendant's challenged conduct, plaintiff suffered "severe personal injuries to my right lung and chest," which required that plaintiff be "hospitalized and a

1    chest tube inserted between my ribs and into my chest cavity in order to drain the blood and other
2    fluids from my chest for approximately three (3) days and a subsequent infection to my right lung
3    I suffered a week later." (FAC at 3.)  Plaintiff states that this incident "almost killed me," and
4    made him "extremely upset." (Id. at 8.)  Plaintiff alleges that Dr. Syverson should not have
5    sedated plaintiff for the biopsy, but should instead have "numb[ed] the entry area and allow[ed]
6    me to be awake like a standard biopsy is done!" (Id. at 13.)  Plaintiff further alleges that "about a
7    month later after coming back to the prison I started having excruciating pain to my right lung."
8    (Id. at 8.)  Plaintiff states that the prison clinic gave him only ibuprofen or tylenol to treat his
9    pain, and that he is "still not receiving proper care." (Id. at 9.)  Plaintiff concludes that he has
10   "gone through a lot of [unnecessary] pain and suffering due to this incident . . . I feel disabled. . .
11   ." (Id.)

12           18.     Attached to plaintiff's FAC is a copy of an internet article describing a liver
13   biopsy procedure. (FAC (Exh. C) (http://www.healthnewsflash.com/conditions/liver_biopsy.
14   php).)  The article assumes that the patient is conscious during the "minor surgery," while local
15   anesthesia is applied to the biopsy site.  The article notes, however, that, "[l]ike any surgery,
16   liver biopsy does have some risks, such as puncture of the lung and gallbladder, infection,
17   bleeding, and pain, but these complications are rare." (Id.)

18           19.     In opposition to defendant's motion for summary judgment, plaintiff relies
19   on the treatment records of Dr. Muhammad Chaudhri, who conducted a second liver biopsy of
20   plaintiff on October 4, 2011, apparently in the medical clinic at CSP-COR.  Plaintiff asks the
21   court to construe these records as his medical expert opinion.  These records reflect the following
22   (Pltf. Exh. I):

23       • The biopsy specimen was apparently obtained with the first and only insertion
24   of an ultrasound-guided needle.  As described by Dr. Chaudhri (ECF No. 41 at 42):

25               The patient was placed on the gurney in the supine position with
                 the right arm extended over the head.  The preliminary ultrasound
26               was performed in the right lower rib cage and liver was localized.

> The right lobe of the liver was selected as there is least amount of blood supply in this region. The area for needle insertion was marked on the skin. The area was prepped. . . . Local anesthesia was achieved by injecting 1% lidocaine subcutaneously and deep into the tissue and around the liver capsule (Glisson capsule). After appropriate delay a small dermatomy was made with a surgical blade. Through the dermatomy under direct ultrasound guidance, a 16-gauge biopsy needle was introduced into the right lobe of the liver away from the vessels and a specimen was obtained. After verifying the adequacy of the sample the sample was placed in formalin. The needle was removed and manual compression was applied at the puncture site until hemostasis was achieved. The area was cleaned and a sterile dressing applied at the puncture site. Post-scan was performed which demonstrated no blood around the liver or at the biopsy site. The patient tolerated the procedure well and there were no immediate complications.

- Plaintiff was "sent back to the housing unit in stable condition" on the same day, without symptoms of pain or other discomfort. (Id. at 42-4, 50.)

- The Pathology Report notes that the "[s]pecimen consists of one core of light brown soft tissue, measuring 1.7 cm in length and 1mm in diameter. Specimen is entirely submitted in one cassette." (ECF No. 41 at 41.)

- Prior to the procedure, plaintiff signed a consent form that generally provided, in pertinent part, plaintiff's acknowledgement that "[a]ll operations and procedures may involve risks of unsuccessful results, complication, injury, or even death, from both known and unforeseen causes, and no warranty or guarantee is made as to result or cure." (Id. at 53.)

D. Defendant's Medical Expert

Defendant Dr. Syverson has not filed a declaration in this action, but has submitted the declaration of his medical expert, Dr. Kim Kirkwood, M.D., a board-certified surgeon, and Full Professor in Surgery at the University of California San Francisco School of Medicine. (ECF No. 30-3 (Dft. Exh. O).) Dr. Kirkwood states that she has "performed numerous liver biopsies like the one performed in this case." Dr. Kirkwood reviewed plaintiff's pertinent medical records and formed the following opinions (id. at ¶¶ 11-3):

////

> On 08/08/07, Dr. Syverson employed appropriate surgical technique in his performance of the ultrasound-guided needle biopsy. Pneumothorax is a known risk of this procedure which can and does occur in the absence of negligence. It is my opinion that this complication occurred despite Dr. Syverson's careful approach to the biopsy.
>
> It is also my opinion that the pneumothorax was recognized quickly following the conclusion of plaintiff's procedure and confirmed by x-ray. Furthermore, the intervention by Dr. Syverson, including the insertion of a chest tube, was both timely and appropriate and resulted in complete resolution of the pneumothorax.
>
> In conclusion, based on my review of all the medical records in this matter, it is my opinion that Dr. Syverson acted within the standard of care in his surgical care and treatment of plaintiff and that the pneumothorax that resulted was not caused by any substandard medical care rendered by Dr. Syverson.

E. Analysis

Notwithstanding the state court judgment in Dr. Syverson's favor on plaintiff's medical negligence claim, this court must independently assess the record evidence to determine whether any material factual dispute precludes the court's decision on the merits of plaintiff's deliberate indifference claim. The legal standards for proving deliberate indifference are substantially higher than those supporting a state law medical negligence claim. Even had plaintiff prevailed in state court, a finding "that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); Toguchi v. Chung, 391 F.3d 1051, 1057, 1060 (9th Cir. 2004). Even gross negligence is insufficient to establish deliberate indifference. Toguchi, 391 F.3d at 1060.

"Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires more than ordinary lack of due care . . . ." Farmer, 511 U.S. at 835 (citation and internal quotations omitted). Inadvertent or negligent medical care does not establish a

constitutional violation. Estelle, 429 U.S. at 105–06. The defendant must have acted with a "sufficiently culpable state of mind," that is, defendant must have known of, but disregarded, an excessive risk to plaintiff's health or safety. Farmer, 511 U.S. at 837.

Throughout the FAC and plaintiff's briefing in opposition to the motion for summary judgment, plaintiff alleges that defendant Dr. Syverson was both "grossly negligent" and "indifferent" to plaintiff's serious medical needs. Plaintiff contends that defendant intentionally sedated plaintiff, rather than use only local anesthesia, "in order to act with malice and deliberate indifference," which was allegedly demonstrated by defendant puncturing plaintiff's right lung three times, "caus[ing] plaintiff to suffer excruciating pain and suffering, nearly lose a lung due to it almost collapsing and plaintiff nearly losing his life due to defendant's carelessness." (ECF No. 21 at 2.) Plaintiff's own interchangeable references to negligence and deliberate indifference underscore the fundamental inadequacies of this civil rights action.

The court initially notes that, although plaintiff alleges defendant punctured his lung each time he attempted to obtain liver tissue via plaintiff's 7th intercostal space, there is no evidence of record demonstrating that plaintiff's lung was punctured more than once. Nevertheless, there is no dispute that Dr. Syverson punctured plaintiff's lung, and that lung tissue was included in the biopsy specimen.

However, there is no evidence of record to support a reasonable inference that Dr. Syverson knew of, and disregarded, an excessive risk of harm to plaintiff by any of his actions.

While the record contains no express rationale for Dr. Syverson's decision to sedate plaintiff for the 2007 biopsy, rather than use only local anesthesia, it is reasonable to infer that plaintiff may have been sedated for security reasons, because the procedure took place in a medical facility outside the prison setting. Plaintiff's second liver biopsy, conducted October 4, 2011, by Dr. Chaudhri, relied only on local anesthesia, but was apparently conducted in the medical clinic at CSP-COR. Regardless, plaintiff is correct that there were no complications

associated with his second biopsy, which utilized only local anesthesia, and that plaintiff recovered quickly.

There is a disputed issue of fact whether defendant Dr. Syverson told plaintiff that the risks of a liver biopsy included the possibility of a punctured lung.  For purposes of summary judgment, the court must assume the truth of plaintiff's allegation that Dr. Syverson failed to inform plaintiff of this risk.  However, even assuming that Dr. Syverson failed to so inform plaintiff, the omission states no more than a negligence claim.  "A claim based on lack of informed consent -- which sounds in negligence -- arises when the doctor performs a procedure without first adequately disclosing the risks and alternatives." Saxena v. Goffney, 159 Cal. App. 4th 316, 324 (2008).  Courts apply a negligence theory in cases where the defendant has "performed the identical operation to which plaintiff had consented" but allegedly failed to inform plaintiff of all the inherent risks of the procedure.  Cobbs v. Grant, 8 Cal.3d 229, 241 (1972); see also Arato v. Avedon, 5 Cal.4th 1172 (1993).  "'[W]hen the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information.  In that situation the action should be pleaded in negligence.'" Moran v. Selig, 447 F.3d 748, 758 (9th Cir. 2006) (quoting Cobbs, 8 Cal.3d at 239).

Moreover, even assuming that defendant failed to secure plaintiff's fully informed consent before performing the biopsy, defendant's puncture of plaintiff's lung supports no more than a negligence claim.  See Menard v. United States, 2012 WL 139484, *5 (M.D. La. 2012) (dismissing Eighth Amendment claim against physician who conducted liver biopsy that allegedly caused collapse of plaintiff's lung, reasoning that, "[a]t most, the Complaint alleges a negligence claim against Defendant [] for allegedly causing Plaintiff's lung to collapse.  Mere negligence, however, does not arise to a violation of the Constitution."); see also Bartholomew v. Traquina, 2013 WL 3537393, *6-9  (E.D. Cal. 2013) (no more than negligence for prison

physician to biopsy wrong shoulder); Candelaria v. Higley, 2013 WL 104910, *8 (W.D.N.Y. 2013) (physician's failure to timely discontinue plaintiff's anti-blood-clotting medications prior to conducting biopsy amounted to no more than "negligence, or even gross negligence, [but] that still would be insufficient to establish deliberate indifference").

Plaintiff offers no evidence to support a reasonable inference that defendant Dr. Syverson, at any time, acted with deliberate disregard of a risk of serious harm to plaintiff. This case does not present a situation where plaintiff failed to obtain needed medical care. Rather, plaintiff was provided with his first liver biopsy because it was deemed medically necessary to assess and treat his Hepatitis C. When complications arose, defendant acted expeditiously to treat plaintiff, then to keep him hospitalized until his symptoms resolved. Plaintiff's subsequent lung infection was also treated and resolved. The court finds that plaintiff has failed to demonstrate how the complications associated with his biopsy, while medically significant, constituted a violation of his civil rights. Moreover, plaintiff's allegations of current pain, and failure to obtain adequate treatment, present potential new claims that must be administratively exhausted before plaintiff can pursue these matters in this court.

In conclusion, plaintiff has demonstrated no more than a negligence claim, which does not rise to the level of "cruel and unusual punishment" proscribed by the Eighth Amendment. Accordingly, summary judgment should be granted in favor of defendant Dr. Syverson.

V. Conclusion

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1. Defendant's motion for summary judgment (ECF No. 30), be granted;

2. Judgment be entered for defendant Dr. Dale Syverson;

3. Plaintiff's motion for an extension of time to proceed with trial after his release from prison (ECF No. 34), be denied as moot; and

4. This action be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within 14 days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:   July 29, 2013

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

card1680.msj